*Tagged*

ORDERED in the Southern District of Florida on ___10/07/09___



_____
**Raymond B. Ray, Judge**
**United States Bankruptcy Court**

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:                                              Case No. 08-26220-BKC-RBR

S & I INVESTMENTS, a Florida          Involuntary Chapter 11
General Partnership,

               Debtor.
_____/

## ORDER GRANTING MOTION TO ASSUME LEASE,
## GRANTING MOTION TO COMPROMISE CONTROVERSY,
## AND DENYING MOTION TO COMPEUL TURNOVER OF FUNDS AS MOOT

This matter came before the Court for evidentiary hearing on September 3, 2009 (the

"Hearing"), upon: (i) the Trustee's Motion Pursuant to 11 U.S.C. Section 365 To Assume Lease

(the "Motion to Assume") [D.E. 95]; (ii) the Trustee's Motion to Compel Turnover of Funds Held

in Court's Registry (the "Motion for Turnover") [D.E. 98]; (iii) the Trustee's Motion to

Compromise Controversy with Stephanie Richmond and Payless Flea Market, Inc. (the "Motion

to Approve Settlement" and, collectively with the Motion to Assume and Motion for Turnover, the

"Motions") [D.E. 167]; (iv) Ilene Richmond's Response to the Motion for Turnover (the "Ilene

Response") [D.E. 187]; (v) Ilene Richmond's Objection to Motion to Approve Settlement (the

"Ilene Objection") [D.E. 188]; and (vi) Lori and Steven Ritenour's Objection to Motion to Approve

Settlement (the "Ritenour Objection" and, collectively with the Ilene Response and Ilene

Objection, the "Objections") [D.E. 193]. For purposes of the Hearing, the Court deems the complaint filed in Adversary Proceeding No. 09-01474-RBR-A[1] to constitute a responsive pleading with respect to the Motion to Assume. At the Hearing, the Court received testimonial and documentary evidence and heard the arguments of counsel. For the reasons delineated below, the Court will grant the Motion to Assume and Motion to Approve Settlement, and deny the Motion for Turnover as moot.

## FINDINGS OF FACT

### (A)    The Motion to Assume

The Trustee filed the Motion to Assume on April 23, 2009. On May 18, 2009, the Court conducted an evidentiary hearing on issues of fact related to: (i) whether the non-Richmond Fee Owners[2] waived the requirements for assignment set out in Article VII of the Lease; and (ii) whether the anti-waiver provision in Article XVII (A) of the Lease would prevent such waiver.

On June 17, 2009, the Court entered an Order Granting the Motion to Assume (the "Assumption Order") [D.E. 139] wherein the Court held that: (i) the Non-Richmond Fee Owners knowingly waived the Assignment Requirements and anti-waiver provisions contained in the Lease by accepting performance from the Debtor without protest for nearly twelve (12) years; (ii) the Lease was property of the Debtor's estate; and (iii) the Trustee was authorized to assume the Lease pursuant to 11 U.S.C. § 365. For purposes of brevity, the Court adopts all of the Assumption Order's Findings of Facts herein.

The principal asset of the Debtor's estate is a 99 year lease of a parcel of commercial real estate located at 2941 East Las Olas Blvd. and 136 Almond Ave., Ft. Lauderdale, Florida (the "Property"). The Property is owned by three (3) fee owners consisting of realty trusts: (i)

---

[1]    The Court has abated the adversary pending the outcome of an appeal in the Southern District of Florida as Case No. 09-61276-ASG. *See Order Abating Adversary Proceeding* [Adv. D.E. #13].

[2]    All capitalized terms shall have the same meaning as defined in the Assumption Order [D.E. 139], unless further defined herein.

2

the Ritenour Trust; (ii) Vreeland Revocable Trust; and (iii) the Richmond Trust (collectively, the "Fee Owners" or each, a "Co-Owner").  The Fee Owners each maintain an equal one-third undivided interest in the underlying fee in the Property.

The Lease was amended in 1962 to: (i) extend the term of the Lease to its current term; and (ii) to provide the mechanism for modification of the annual rent payment due under the Lease (the "1962 Amendment").  The 1962 Amendment set fixed rates of $200 per month per fee owner for lease payments through 1967, and thereafter implemented a series of complicated five year escalator or de-escalator clauses (as the case may be) that were tied to then existing iterations of the Consumer Price Index[3] (the "Escalator Provision").

Specifically, the Escalator Provision provides that each five years, an averaging of the CPI is to take place and to the extent that there is an aggregate change of 6 % or more, either up or down, the rental obligation for the ensuing 5 year period will be adjusted by that factor. The Court notes that until the Non-Richmond Fee Owners retained economist William Stronge to testify at the Hearing, no party had made a calculation pursuant to the Escalator Provision over the 42 year period from 1967 to 2009.  As such, the Escalator Provision was never implemented and the 1967 base rate of $200.00 per month per fee owner was paid each and every month to all Fee Owners until October 2007.

Beginning in October 2007, the Ritenours stopped cashing rent checks from the Debtor on behalf of the Ritenour Trust.  Prior to October 2007, the Ritenour Trust (and its predecessors-in-interest) had accepted monthly payments of $200 and never placed any restrictive endorsements on the rent checks received pursuant to the Lease.  On June 12, 2008, however, the Ritenours sent a letter to Ilene Richmond and Stephanie Richmond asserting for the first time that the monthly rent due to the Ritenours under the Lease was $1,379.86 per month, rather than the $200.00 rent payments that the Ritenours had previously accepted

---

[3]        1962 Amendment at Section 2.

without protest (the "June 12th 2008 Letter").  On August 8, 2008, the Ritenours sent a second correspondence to Ilene Richmond that returned all rental checks the Ritenours had received from the Debtor between October 2007 and June 2008 (the "August 8th 2008 Letter").  On November 24, 2008, approximately one month after the Petition Date, the Ritenours sent Ilene Richmond and Stephanie Richmond a 15-day written notice (the "Default Notice") advising the Richmonds that they were in default under the Lease as a result of their refusal to pay the amount the Ritenours had requested under the Lease.  The Default Notice requested that the Richmonds cure the alleged default by paying the sum of $70,589.86 on or before December 15, 2008.

At the Hearing, Lori Ritenour testified that as early as 1988, when she ordered a title examination of the Property, she learned that the Escalator Provision existed but had never been implemented.  Ms. Ritenour further testified that from 1988 until August 2007 she consulted with various lawyers regarding the enforcement of the Escalator Provision, but that she did not take affirmative action of any kind to enforce the Escalator Provision until the mailing of the June 12th, 2008 Letter.  Ms. Ritenour did not satisfactorily explain this twenty (20) year hiatus.

In the case of the Vreeland Trust, Ms. Vreeland[4] testified that she was aware of the existence of the Escalator Provision dating as far back as 1997 through various conversations she had with her friends and family advising her that she might have been entitled to more rent under the Lease.  Ms. Vreeland further testified that she accepted rent checks in the amount of $200.00 per month without restrictive endorsement from 1997 through February 2009 (approximately four (4) months after the Petition Date).  Finally, Ms. Vreeland testified that until March 2009, the first month she refused a rent payment, Ms. Vreeland did not enforce the Escalator Provision because she did not require any additional income to support herself.

---

[4]     The Court notes that Ms. Vreeland and Lori Ritenour are related by marriage as Lori Ritenour testified that Ms. Vreeland is her aunt.

4

With regards to the Richmond Trust, the evidence indicates that Ilene Richmond accepted rent checks in the amount of $200.00 per month without restrictive endorsement from the time she acquired her interest as a Fee Owner through well after the Petition Date. Moreover, the Non-Richmond Fee Owners failed to introduce evidence that indicated whether Ilene Richmond ever: (i) refused to accept and cash a $200.00 rent payment; (ii) sought to enforce the Escalator Provision; or (iii) sought to terminate the Lease. The Court also notes that Ilene Richmond supports the relief sought by the Trustee in his Motion to Assume.

The Property currently generates annual gross revenue in excess of $200,000 from five (5) long term sub-tenants currently occupying it. After deducting rent[5] and expenses, the Property generates minimum annual net revenue in excess of $100,000. The Trustee testified that the assumption of the lease, pending a determination of cure, is in the exercise of his business judgment. The Trustee has retained the services of a real estate broker, Marika Tolz, to assist him in maximizing the value to be recovered on behalf of the Estate.

**(B)     Motion to Approve Settlement and Motion for Turnover**

On or about August 1995, the Debtor and Payless Flea Market, Inc. ("Payless") entered into a ten (10) year Business Property Lease for the Property (the "Payless Sublease"), which the parties renewed sometime in October 2003.

The Debtor, on or about August 3, 2004, filed a Complaint in Broward County Court for Tenant Eviction and Recession of the Payless Sublease. The case was eventually transferred to the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida and docketed under Case No.: 04-14172(08). Payless filed a counterclaim. Payless, from the date of the filing of the lawsuit, has paid rents into the State Court Registry (the "Registry"). As of August 12, 2009, $567,668.53 is being held in the Registry. There are currently written and oral

---

[5]     For purposes of calculating the minimum net revenue generated by the Property, the Trustee incorporated the maximum going forward annual rent payment demanded by the Non-Richmond Fee Owners.

subleases at the Property that generate, or have the capacity to generate, approximately $17,300 per month in gross rental income.

Payless also filed a separate complaint against the Debtor, Ilene and Stephanie in the Circuit Court of the 17th Judicial Circuit in and far Broward County, Florida. That case was docketed under Case No.: 05-017836 and consolidated with 04-14172(08).

By virtue of the above referenced law suits (the "State Court Suits"), Payless is a creditor of the Debtor holding two outstanding judgments against the Debtor, Ilene Richmond, and Stephanie Richmond, jointly and severally, as well as other claims.  Payless has timely filed its proof of claim in this case asserting an aggregate claim in excess of $908,085.70 (the "Payless Claim") [Proof of Claim No. 3].

The Debtor, Ilene and Stephanie filed Notices of Appeal from both judgments entered in favor of Payless.  The cases are currently pending in the Fourth District Court of Appeal and are docketed as Case No.: 4D 08-486 and Case No.: 4D 08-4257.

On August 13, 2009, Payless, the Trustee and Stephanie Richmond executed a settlement agreement (the "Settlement Agreement") in an effort to: (i) liquidate the Payless Claim; (ii) provide a distribution to Payless; (iii) release the funds in the Registry; (iii) allow the estate to regain operation control of the Property; and (iv) cap the estate's and Stephanie Richmond's potential exposure to further adverse judgments in the State Court Suits.   The Settlement Agreement, in material part, provides for the following:

a.      A dismissal of all of the referenced State Court Suits (except as between Payless and Ilene);

b.      Allowance and payment of the filed claims of Payless subject to the Settlement Agreement;

c.      Immediate release of the funds in the Registry to be utilized as provided in the Settlement Agreement, including an initial payment to Payless in the amount of $300,000 and a subsequent payment in the amount of $240,000;

6

      d.      Immediate establishment of an escrow to fund the outstanding obligations of Payless, if any, for maintenance and upkeep of the Property under the Payless Sublease;

      e.      Payment by Stephanie for the account of Payless in the amount of $10,000 to be applied towards the attorneys' fees incurred by Payless;

      f.      Release of Payless from its obligations under the Payless Sublease (with full releases) and immediate return of operation of the Property to the Trustee; and

      g.      Execution and delivery of comprehensive released and dismissals of litigation as provided.

The Settlement Agreement was conditioned upon its approval by the Court and the Debtor estate's assumption and cure of the Lease.  At the Hearing, the Trustee testified that in his business judgment the Settlement Agreement was in the best interest of the Debtor's estate because it: (i) substantially reduces the claims Payless has against the estate; (ii) terminates the Payless Sublease, thus facilitating the monetization of the underlying Lease; and (iii) caps the Estate's administrative expenses related to continued litigation in the appeal of the Payless Judgments.

As part of the Settlement, Stephanie Richmond has agreed to provide consideration in the form of cash, and loans to assist in any cure obligations.

Ilene Richmond and the Non-Richmond Fee Owners did not introduce any evidence in support of their Objection to the Motion to Approve Settlement.

**(C)    Candor of Witnesses**

The Court having listened to the testimony of Stephanie Richmond, Leslie Osborne, Steven Levy, Lori Ritenour, Lorraine Vreeland, Kenneth Hemmerle, II, and Dr. William Stronge (collectively, the "Witnesses") under oath, and having had the opportunity to review their candor and demeanor, finds their testimony to be truthful and reliable.

**CONCLUSIONS OF LAW**

The issues before the Court are: (i) whether the non-Richmond Fee Owners can enforce the Escalator Provision retroactively, thus impacting the cure obligation of the estate; (ii) whether the anti-waiver provision in Article XVII (A) of the Lease prevents a waiver of the Escalator Provision; (iii) whether the Escalator Provision is self-executing; (iv) calculation of cure amount due under the Lease; (v) whether the non-Richmond Fee Owners can enforce the Escalator Provision for collection of future rent; (vi) calculation of future rent under the Lease; (vii) whether the Settlement Agreement with Stephanie Richmond and Payless satisfies the test enumerated in *In re Justice Oaks II, Ltd.*, 898 F.2d 1544, 1548 (11th Cir. 1990); and (viii) whether the release sought by Stephanie Richmond in connection with the Settlement Agreement, in the form of a bar order, is fair and equitable in accordance with *In re Munford, Inc.*, 97 F.3d 449 (11th Cir. 1966).  The Court adopts, as necessary, all conclusions of law set forth in its prior Assumption Order.

**(A)    The Fee Owners Cannot Enforce the Escalator Provision in Calculating the Cure Due Under the Lease**

Property interests in bankruptcy are created and defined by state law. *Butner v. U.S.*, 440 U.S. 48, 55 (1979), *In re Porterfield*, 331 B.R. 480 (Bkrtcy. S.D. Fla. 2005).  Under Florida state law, the Debtor was the lessee under the Lease as of the Petition Date.

**(1) Waiver**

The United States Bankruptcy Court for the Southern District of Florida has held that, "[a] lessor's failure to enforce the provisions of a lease prevents the lessor from subsequently enforcing those provisions." *In re Boogart of Florida, Inc.*, 17 B.R. 480, 485 (Bankr. S.D. Fla. 1981).  Thus, a waived lease provision is for all intents and purposes stricken from the lease. *In re Boogart of Florida, Inc.*, 17 B.R. at 485 (citing 17A C.J.S. "Contracts" § 493).

Under Florida law, waiver is either an intentional relinquishment of a known right, or conduct giving rise to a reasonable inference of the relinquishment of a known right. *Sentry Ins. v. Brown*, 424 So.2d 780, 784 (Fla. 1st DCA 1982); *Singer v. Singer*, 442 So.2d 1020, 1022 (Fla.

3rd DCA 1983). Waiver requires: (i) the existence of a right that may be waived, (ii) actual or constructive knowledge of the right, and (iii) the intention to relinquish the right (collectively, the "Waiver Test"). *Matter of Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982). Waiver may be express or may be implied from conduct. *Id*. The determination of the question of waiver is a factual inquiry and is within the discretion of the trier of fact. *Id*. at 1348.

The doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted. *In re Marineland Ocean Resorts, Inc.*, 242 B.R. 748, 757 (Bankr. M.D. Fla. 1999) (citing *Gilman v. Butzloff*, 155 Fla. 888, 22 So. 2d 263 (1945)). Moreover, Florida Courts have long recognized that provisions contained in a lease may be waived. *See Charlotte Harbor & N. Ry. Co. v. Burwell*, 56 Fla. 217, 48 So. 213 (1908); *Farmer's Bank and Trust Co. v. Palms Publishing Co.*, 86 Fla. 371, 98 So. 143 (1923). Since it appears to the Court that the Escalator Provision was inserted for the benefit of the Fee Owners, the Fee Owners have the ability to waive the Escalator Provision. *See Marineland Ocean Resorts, Inc.*, 242 B.R. at 757.[6] The first prong of the Waiver Test is satisfied. *See Garfinkle*, 672 F.2d at 1347.

All Fee Owners had constructive knowledge of the Escalator Provision because the 1962 Amendment was recorded in the Broward County public records. The Fee Owners also had actual knowledge of the Escalator Provision for extended periods of time. Both Vreeland and Ritenour, and their predecessors in interest, each accepted monthly rent checks in the amount of $200.00 for over four decades without seeking to enforce the Escalator Provision. Ritenour testified that she had actual knowledge of the Escalator Provision as early as 1988 and did nothing about it until June 2008. Ilene Richmond has never rejected a rent payment from the Debtor. The second prong of the Waiver Test is thus satisfied. *See Garfinkle*, 672 F.2d at 1347.

---

[6]      The Court also notes that the Fee Owners are bound by any estoppel or waivers made by their predecessors-in-interest with respect to the Lease. See, e.g., *Smith v. Urquart*, 176 So. 787, 788 (1937) (" . . . where an estoppel is operative as between the original parties to the transaction, it is also effective as to their privies in contract.") and *In re Gilda Gradenigor, Inc.*, 80 B.R. 666, 668 (Bkrtcy. D. Del 1987).

9

In *AMC/Jeep of Vero Beach, Inc. v. Funston*, the court held that lessors had acquiesced to an assignment or subletting by: (i) accepting the benefits of a lease after the assignment or subletting by the original lessee, and (ii) engaging in a course of conduct that reasonably signified acceptance of the assignment.  403 So.2d 602 (Fla. 4th DCA 1981).  Here, the Fee Owners knowingly accepted rent in the amount of $200 for over four decades without protest. The Court thus finds that Fee Owners intended to relinquish their rights under the Escalator Provision.  *See Garfinkle*, 672 F.2d at 1347.

In light of the above, the Waiver Test is satisfied; the Fee Owners have waived their rights under the Escalator Provision.  *See id.*

Further, there is authority that holds that even if only one of the Fee Owners waived the Escalator Provision by accepting rental payments from the Debtor, the Escalator Provision would still be waived as to all Fee Owners.  As stated in *Fredeking v. O.R. Grimmett*, 86 S.E.2d 554, 564 (W.V. 1955):

> Under the American authorities the lessee's covenants, unless expressed otherwise, are joint and indivisible under a lease executed jointly by all the tenants in common.  The heirs of a deceased lessor are in no higher position, with respect to the covenants in the lease than that they would be if they jointly executed the same lease, although the lease may expressly reserve to each his proportionate interest in the rents. *Citing Howard v. Manning*, 79 Okla. 165, 170 (Okl. 1920).
>
> ***
>
> When it appears in a suit instituted by all the owners of undivided interests in real estate subject to a lease, which contains a forfeiture provision for breach of a condition of the lease by the lessee, the one of such owners has waived his right to enforce a forfeiture of the lease, **forfeiture of the lease may not be had by the owners of the other undivided interests even though they have not waived their right to forfeit such lease or are not estopped from enforcing such right of forfeiture.**

(emphasis added).  Here, the Fee Owners each maintain an equal one-third undivided interest in the underlying fee in the Property.  It is undisputed that Ilene Richmond supports the Trustee's Motion to Assume, has never attempted to enforce the Escalator Provision, and

continues to accept rent in the amount of $200.00 per month on behalf of the Richmond Trust. Thus, the Court holds that the Richmond Trust's waiver of the Escalator Provision acts as a continuing waiver for all Fee Owners.

**(2)    Estoppel**

The elements of estoppel are: (i) the party against whom estoppel is sought must have made a representation about a material fact that is contrary to a position it later asserts; (ii) the party claiming estoppel must have relied on the representation; and (iii) the party claiming estoppel must have changed its position to its detriment in reliance on the representation. *Watson Clinic, LLP v. Verzosa*, 816 So. 2d 832, 834 (Fla. 2nd DCA 2002).  Estoppel rests on the premise that the party asserting the estoppel has acted in reliance upon the prior inconsistent conduct. *Pelican Island Property Owners Ass'n, Inc. v. Murphy*, 554 So. 2d 1179, 1181 (Fla. 2nd DCA 1989). Silence in the face of an opportunity or duty to speak may also give rise to estoppel. *Garfinkle*, 672 F.2d at 1346.

For a period of at least 12 years, the Debtor has acted in reliance on the acquiescence and inaction of the Non-Richmond Fee Owners with respect to the acceptance of payments on S & I Investment check stock and for a period of some 43 years in not enforcing the Escalator Provision.  The conduct of the Non-Richmond Fee Owners (i.e., inaction in the face of known contractual rights) can only be construed as representations that the Debtor relied upon.  The payment of taxes, maintenance of the property and other undertakings of the Debtor constitute justifiable reliance by the Debtor on the representations of the Non-Richmond Fee Owners to its potential detriment.  Thus, the Non-Richmond Fee Owners are estopped from enforcing the Lease provisions that they and their predecessors in interest waived, but now wish to enforce.

**(3) Course of Dealing**

It is well-established law in the state of Florida that, notwithstanding the language contained in contract, subsequent acts may modify the terms of the contract, even in the absence of writing.  *See, e.g., Rhodes v. BLP Associates, Inc.*, 944 So.2d 527, 530 (Fla 4th DCA

2006); *Gallagher v. Dupont*, 918 So. 342, 347 (Fla 5th DCA 2005); *White v. Ocean Bay Marina, Inc.*, 778 So.2d 412 (Fla 3rd DCA 2001).

Here, the parties have consented to the waiver of the Escalator Provision for decades, and consideration, in the form of timely rent payments, is, has been and will continue to be paid to the Fee Owners. The Court finds that these actions have modified the terms of the Lease so as to waive the Elevator Provision.

### (4) Laches

Laches is defined as "an omission to assert a right for an unreasonable and unexplained length of time under circumstances prejudicial to the adverse party." 22 *Fla. Jur.* Sect. 69. The applicability of laches depends on the circumstances of each case. Where applicable, laches bars any action that falls within its ambit.

Under Florida law, a defendant who seeks to assert laches must prove the following: (i) conduct by the defendant that the plaintiff complains of; (ii) the failure of the plaintiff, despite his knowledge or notice of defendant's conduct, to assert his right by suit; (iii) lack of knowledge on the part of the defendant that the plaintiff will assert the right upon which he bases his suit; and (iv) injury or prejudice to the defendant if relief is accorded. *See In re Olde Florida Investments, Ltd.*, 293 B.R. 531 (Bankr. M.D. Fla 2003).

Here, all of the elements of laches are satisfied. First, it is undisputed that the Debtor's (and its predecessors') rent payments were accepted for 42 years. Second, despite the Fee Owners' knowledge of the Elevator Provision, going back at least until 1988, they failed to take any action to assert the rental increases that the Escalator Provision would provide. Third, the Debtor, having never received any communication from the Ritenours or the Vreelands objecting to the monthly rent payments, had no reason to believe that the Non-Richmond Fee Owners would, after 42 years of inaction, seek to enforce the Escalator Provision. Fourth, the potential prejudice to the Debtor and the estate is extraordinary. To pay the cure that the Non-Richmond Fee Owners assert, an aggregate amount in excess of $1.5 million, would effectively

eliminate any chance that this estate has to assume and assign what is otherwise a substantially below market, long term lease. In short, laches precludes any claim to the cure amount sought by the Non-Richmond Fee Owners.

### (B)   Anti-Waiver Provision Does Not Prevent Waiver of Escalator Provision

The Lease contains a so-called "anti-waiver" provision. Article VII (A) of the Lease provides that:

> It is s covenanted and agreed that no waiver or breach of any of the covenants of this lease contained (sic) shall be construed to be a waiver of any succeeding breach of the same covenant.

The Court of Appeals for the Eleventh Circuit has recognized that anti-waiver provisions can be enforceable and have been upheld by Florida courts. However, such recognition is not without limitation. See MCA Television Ltd. v. Public Interest Corp., 171 F.3d 1265, 1270 (11th Cir. 1999); Western World, Inc. v. Dansby, 603 So.2d 597, 601 (1st DCA Fla. 1985); Philpot v. Bouchelle, 411 So.2d 1341 (1st DCA Fla. 1982). An examination of the specific language contained in the particular anti-waiver provision is required. See Western World, Inc. v. Dansby, 603 So.2d. at 601. In Dansby, the Court found that an anti-waiver provision, which had very similar language to the provision in this Lease, did not prevent a waiver, because the language did not specifically state that certain types of behavior did not constitute a waiver. 603 So.2d. at 601. By contrast, in Philpot v. Bouchelle, the court upheld an anti-waiver provision because it determined that the parties had specifically agreed that acceptance of late rental payments would not constitute a waiver of the lessor's rights. 411 So.2d at 1344-1345. The difference in the anti-waiver provisions in Philpot and Dansby lies in the specificity of the behavior that would or would not constitute a waiver. See 603 So.2d. at 601; 411 So.2d at 1344-1345.

Here, the Debtor and the Non-Richmond Fee Owners did not specifically agree that payment of rent not in compliance with the Escalator Provision would prevent a waiver. The anti-waiver provisions of the Lease are thus not enforceable in that context.

### (C)   Escalator Provision is Not Self-Executing

The Court holds that the plain language of the Escalator Provision coupled with the exercise of common sense establishes that the Escalator Provision is not self-executing. The Escalator Provision provides in part:

> At the end of each (5) year period . . .during the term of the [Lease], the cost of living index at that time will be compared to the index figure at the time the next previous comparison was made . . . It is specifically understood that no change shall be made in the annual rent hereunder at any time unless there shall here be, an increase, or decrease, of six percent (6%) or more since the previous comparison and adjustment was made.

Because the Escalator Provision prohibits a change in the annual rent unless there is an increase (or decrease) in inflation from the time a prior comparison is made, it is axiomatic that an actual comparison must be made as a condition for any adjustment in rent. This conclusion is the only logical method to interpret the Escalator Provision because the lessee would not know the correct amount of rent due under the Lease absent calculation and notification of the adjusted rent. Accordingly, the Court holds that the Escalator Provision is not self-executing, but rather, requires the Fee Owners to: (i) calculate the adjustment required therein; and (ii) notify the Debtor of any adjustment.

### (D)   Calculation of Cure Amount Due Under the Lease

Having found that the Fee Owners waived the Escalator Provision and that the Escalator Provision is not self-executing, the Court holds that the monthly rent payment due to each Fee Owner under the Lease is $200.00 per month. Accordingly, the Court calculates the following cure amounts for each Fee Owner under the Lease:

### (1) The Ritenour Cure Amount

The unrebutted evidence introduced at the Hearing indicates that the Ritenours received and accepted monthly rental payments in the amount of $200.00 per month through and including September 2007. From October 2007 through September 2009, the Ritenours have not accepted any rental payments they are due to receive under the Lease. Accordingly, the

Debtor is obligated to cure twenty-four (24) months of unpaid rent, for an aggregate principal

cure payment in the amount of $4,800.00 plus interest as provided under the Lease.

### (2) The Vreeland Cure Amount

The unrebutted evidence introduced at the Hearing indicates that A. Lorraine Vreeland

received and accepted monthly rental payments in the amount of $200.00 per month through

and including February 2009.  From March 2009 through September 2009, Vreeland has not

accepted any rental payments she is due to receive under the Lease.  Accordingly, the Debtor is

obligated to cure seven (7) months of unpaid rent, for an aggregate principal cure payment in

the amount of $1,400.00 plus interest as provided under the Lease.

### (3) The Ilene Richmond Cure Amount

The evidence introduced at the Hearing indicates that Ilene Richmond has received

and accepted all monthly rental payments she is due to receive under the Lease.  Accordingly,

the Debtor does not owe Ilene Richmond any past due rent under the Lease.

### (E)    Escalator Provision is Enforceable for Collection of Future Rent

Although waived for the collection of past due rent, the anti-waiver provision prohibits the

waiver of the Escalator Provision for calculating future rent under the Lease.  As the court stated

in *Rehoboth Mall Ltd. Partnership v. NPC Intern., Inc.*:

> Generally, no waiver provisions 'give a contracting party some assurance that its
> failure to require the other party's strict adherence to a contract term ... will not
> result in a complete and unintended loss of its contract rights if it later decides
> that strict performance is desirable.'  In other words, notwithstanding its
> nomenclature, a no waiver provision actually anticipates one or more waivers,
> and protects the waiving party by stating that those individual waivers shall not
> operate as permanent waivers.'

953 A.2d 702, 704-05 (Del. 2008) (citation omitted).  Here, the Fee Owners' prior waivers of the

Escalator Provision do not prevent enforcement of the provision on a going forward basis and

should they chose to do so, commencing with the next adjustment period under the 1962

Amendment, such calculation will be enforced.

### (F)    Calculation of Future Rent

15

The non-Richmond Fee Owners' expert testified at the Hearing that the starting figure for calculating any increase (or decrease) in rent pursuant to the Escalator Provision is $7,200 per year, the amount of rent that was due under the Lease for all periods immediately prior to the time periods subject to the Escalator Provision.  The Escalator Provision further provides that the calculation of any increase (or decrease) in rent shall be calculated every five (5) years starting on November 30, 1967.  Under the Escalator Provision the most recent inflation adjustment date was November 30, 2007.  The first attempt to enforce the Escalator Provision occurred on June 12, 2008, more than six months after the last inflation adjustment date.  For purposes of enforcing the Escalator Provision, the next inflation adjustment date is November 30, 2012.  Accordingly, the Court holds that the Debtor shall be required to pay future rent in the amount of $600 per month through and including November 30, 2012.

By November 30, 2012, the Fee Owners, should they chose to exercise their rights, shall compare the cost of living index existing on that date with the position in existence on January 15, 2007.  For every rise or fall of six (6%) or more in the index figure above its position as of January 15, 2007, the annual rent in the amount of $7,200 shall be increased, or decreased, in direct proportion to the increase or decrease, in the index figure, and shall continue in such altered amount for the next five (5) years.  At the end of each five (5) year period thereafter during the term of the Lease, should the Fee Owners chose to implement the Escalator Provision, the cost of living index at that time will be compared to the index figure at the time the next previous comparison was made, and, on each of such occasions, provided there has been an increase, or decrease, in the cost of living index of six percent (6%) or more for the five year period, the annual rent will be increased, or decreased, proportionately.  It shall be the responsibility of the Fee Owners to calculate the inflation adjustment under the Escalator Provision and notify the Debtor or its successors-in-interest, in advance of any required adjustment.

**(G)    Settlement Agreement Satisfies Justice Oaks Test**

This Court has broad discretion to approve a settlement or compromise, and it should do so unless the proposed settlement falls below the lowest point in the range of reasonableness. *In re Bi-Coast Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993). The Eleventh Circuit has set forth the following facts that must be considered in determining whether to approve a settlement or compromise: (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable view in the premises. *In re Justice Oaks II, Ltd.*, 898 F.2d at 1548.

The Court holds that the principles set forth in *Justice Oaks*, when viewed in light of the Payless Claim, the costs and uncertainties of the pending appeals, and the terms of the Settlement Agreement, which provide a substantial reduction of the Payless Claim, clearly justify the approval of the Settlement Agreement. The Court holds that the Settlement Agreement is well above the lowest point in the range of reasonableness because: (i) Payless is waiving substantial claims it holds against the Debtor's estate; (ii) Payless is terminating its interest in the Payless Sublease for the ultimate benefit of the Debtor's estate; and (iii) the Settlement Agreement limits the Estate's administrative expenses associated with litigating the Payless Judgments. *See In re Justice Oaks II, Ltd.*, 898 F.2d at 1548.

      **(H)    Release Sought by Stephanie Richmond is Fair and Equitable and Entry of Channeling Injunction and Bar Order is Appropriate**

Procedurally, a party may seek a channeling injunction and bar order at the time that it requests the court's approval of its proposed settlement agreement. *See In re Munford, Inc.*, 97 F.3d at 452 (affirming the bankruptcy court's decision to approve the proposed settlement agreement and contemporaneously issue an order enjoining the non-settling defendants from asserting contribution and indemnification claims).

17

Substantively, "[a] bankruptcy court faced with a motion to compromise a controversy has a duty to apprise itself of all necessary facts to make an intelligent evaluation and to make an independent judgment as to whether the settlement presented is fair and equitable." *Romagosa v. Thomas*, 2006 U.S. Dist. LEXIS 50629, *18 (M.D. Fla. July 25, 2006). "A bankruptcy court is not obligated to actually rule on the merits of the various claims; it simply must assess the probability of success of such claims. A bankruptcy court should only approve a settlement when it is fair and equitable and in the best interest of the estate." *Id.* at *18–19 (citation omitted). Also, "[a] bankruptcy court may certainly give weight to the trustee's informed judgment that a compromise is fair and equitable." *Id.*

### Ilene Richmond's Objections

**1. "The bankruptcy court lacks jurisdiction over the contract between Stephanie and Ilene."**

Ilene asserts that because "[a] contract dispute between two non-debtor parties is not a core proceeding or a proceeding arising in or under title 11," the bankruptcy court has no jurisdiction to enter a bar order, which would modify her 2006 contract with Stephanie. The Eleventh Circuit, however, has addressed this issue in *Munford* and held that a bankruptcy court has proper jurisdiction in such a case. *See* 97 F.3d at 454. There, the non-settling defendants argued that the bankruptcy court lacked subject matter jurisdiction to enter a bar order because the claims involved were between non-debtors. The court rejected that argument and found that "for purposes of subject matter jurisdiction the civil proceedings related to bankruptcy need not be against the debtor or against debtor's property." *In re Munford, Inc.*, 97 F.3d at 454. Further, the court concluded that "section 105(a) and rule 16 taken together provide ample authority for the bankruptcy's court [sic] action. Section 105(a) clearly provides that the bankruptcy court can enter 'any order' necessary or appropriate to carry out the provisions of the Bankruptcy Code, while rule 16 authorizes the use of special procedures to assist the

parties in reaching a settlement." *Id.* at 455.  Ilene's objection on this point is therefore without merit.

### 2. "The general release sought by Stephanie is unfair and inequitable."

"When determining whether to enter a bar order against non-settling defendants, the court must make a reasoned determination that the bar order is fair and equitable. In making such a determination, courts consider the interrelatedness of the claims that the bar order precludes, the likelihood of non-settling defendants to prevail on the barred claim, the complexity of the litigation, and the likelihood of depletion of the resources of the settling defendants." *In re Munford, Inc.*, 97 F.3d at 455 (citation omitted).  Here, Ilene argues that the "Debtor fails to demonstrate why the requested release is a necessary term of the Agreement, or that it is fair and equitable to Ilene. Nor does the Debtor allege that the release is necessary or appropriate for carrying out the purposes of Chapter 11."

Generally, courts have recognized that "bar orders play an integral role in facilitating settlement.  Defendants buy little peace through settlement unless they are assured that they will be protected against co-defendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 494 (11th Cir. 1992).

Further, it is not a requirement for the entry of a bar order that such an order be included as a condition precedent in the settlement agreement.  Judge Hyman found, in *In re Grau*, that a bar order was an essential component of the proposed settlement agreement where "any further objections by the Creditor [would] be disruptive to the administration of th[e] Case" and "[f]urther objections [would] deplete or even eliminate any distribution for administrative expenses and unsecured creditors." 267 B.R. 896, 900 (Bankr. S.D. Fla. 2001).  Thus, Ilene's contention that the requested bar order is not integral to the settlement agreement or essential for purposes of carrying out the purposes of Chapter 11 is misplaced.

Ilene also argues that a bar order would be unfair and inequitable because "[t]he Agreement does not require Payless to give releases or satisfactions; in other words, Payless can apply the money to its unliquidated claims and then continue to pursue Ilene for the full amount of the Judgments."

However, the agreement contemplates that Ilene would receive a dollar-for-dollar credit against any subsequent judgment entered against her. Such an arrangement constitutes a fair and equitable judgment offset. *See In re Covington Properties, Inc.*, 255 B.R. 77, 80 (Bankr. N.D. Fla. 2000). Thus, Ilene's argument that the settlement agreement would allow Payless to "apply the [settlement] money to its unliquidated claims and then continue to pursue Ilene for the full amount the Judgments" is simply inaccurate.

Finally, "public policy strongly favors pretrial settlement in all types of litigation." *In re Munford, Inc.*, 97 F.3d at 449; *In re Bicoastal Corp.*, 164 B.R. 1009 (Bankr. M.D. Fla. 1993). The rationale behind this policy is that litigation, depending upon its complexity, can deplete the resources of the parties and the taxpayers for extended periods of time. *In re Munford, Inc.*, 97 F.3d at 455; *Wald v. Wolfson* (*In re U.S. Oil and Gas*), 967 F.2d 489, 493 (11th Cir. 1992). Furthermore, litigation costs are particularly burdensome on the bankruptcy estate given the financial instability of the estate. *Romagosa v. Thomas*, 2006 U.S. Dist. LEXIS 50629 at *20 (M.D. Fla. July 25, 2006). As such, public policy considerations support the position that the bar order should be entered in this case.

For all of the foregoing reasons, It is **ORDERED** that:

A.      The Motion to Assume is **GRANTED**.

B.      The Motion to Approve Settlement is **GRANTED**.

C.      The Motion for Turnover is **DENIED AS MOOT**, as turnover of the registry funds shall occur forthwith in compliance with the terms of the Settlement Agreement.

D.      The Objections are **OVERRULED**.

E.     If the Trustee elects to assume the lease, post-petition rental payments due under the Lease shall be paid forthwith as the rate of $200.00 per month per Fee Owner through to the next adjustment period.

F.     The total cure amount due in connection with the assumption of the Lease pursuant to 11 U.S.C. Section 365 is $6,200.00, plus interest as provided under the Lease.

G.     The Trustee shall promptly remit payment of the Cure Amount to the Fee Owners upon the earlier of: (i) the closing of any sale of assignment of the Lease from proceeds thereof; or (ii) the accumulation of sufficient funds in the estate from the operation of the Property by the Trustee.

H.     The parties are authorized to perform in accordance with the Settlement Agreement .

I.     Third parties (for all purposes in this Order defined as any "person" or "entity" as further defined in Section 101 of the Bankruptcy Code), and specifically including Ilene Richmond and any party who has appeared in these proceedings are hereby permanently barred, and joined and restrained from commencing, prosecuting, or asserting any request, claim, or cause of action including but not limited to, causes of action for contribution or indemnification, however denominated, against the Trustee, the Estate and/or Stephanie Richmond and specifically precluding any litigation or claims in any matter relating to the Ground Lease, Subleases and/or the Debtor except as contained in this Order and/or a confirmed Chapter 11 Plan in this case.  Further, Ilene Richmond or any entity related to Ilene Richmond, is enjoined and barred from contesting this Agreement, except through appropriate objection in the Bankruptcy Court to the Agreement or a Chapter 11 Plan, and Ilene Richmond is specifically barred and enjoined from seeking contribution from the Debtor or Stephanie Richmond, or taking any action against Stephanie Richmond or the Trustee for entering into this Agreement or the Plan once same is approved by the Bankruptcy Court, or for any further

damages of any kind or nature that Ilene Richmond may allegedly incur by virtue of further litigation with Payless.

J.      Any Chapter 11 Plan confirmed in this case will contain the provisions of this Channeling Injunction and Bar Order.

K.      This Court shall retain jurisdiction over all affected parties with respect to any matters, claims, or rights arising from or related to the implementation and interpretation of this Order.

### 

The Clerk shall provide copies to:

James Fierberg, Esq.

*Attorney Fierberg is directed to serve a conformed copy of this order upon all interested parties and to file a certificate of service in accordance therewith.*